Filed 6/12/15  In re Jacob W. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re JACOB W., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D066777 |
| Plaintiff and Respondent, | (Super. Ct. No. SJ10344C) |
| v. | |
| J.W. et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of San Diego County, Joe O. Littlejohn, Judge.  Affirmed.

Neil R. Trop, under appointment by the Court of Appeal, for Defendant and Appellant J.W.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant T.F.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

J.W. and T.F. appeal an order terminating their parental rights to their son, Jacob W., under Welfare and Institutions Code section 366.26.[1]  J.W. contends the trial court erred by denying his motion to place his son in his care or grant additional reunification services to him.  (§ 388.)  J.W. and T.F. challenge the findings Jacob was likely to be adopted within a reasonable time and the parent/child relationship exception to termination of parental rights did not apply.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Jacob is the son of J.W. and T.F.  In December 2012 the San Diego County Health and Human Services Agency (Agency) detained Jacob in protective custody at birth because of T.F.'s mental health condition, substance abuse history and child welfare history.  T.F. had three other children who were not in her care.  She also had an infant son who died while in the care of his father.  On another occasion, T.F. left an eight-month old daughter in the care of an acquaintance, telling him she would be gone for several hours.  Twenty-four hours later T.F. returned to find her daughter severely injured.  T.F. entered a rehabilitation program but did not complete it.  She moved to San Diego with J.W. when she was pregnant with Jacob.

---

1       Unless otherwise indicated, further references are to the Welfare and Institutions Code.

2

J.W. had a criminal history including assault, theft, disorderly conduct, vandalism, public intoxication and domestic violence. J.W. and T.F. had a history of domestic violence. In January 2011 J.W. was jailed for aggravated assault and domestic violence against T.F. He was under the influence of methamphetamine at the time. J.W. had a history of polysubstance abuse. He denied current drug use.

During the first six-month review period, J.W. and T.F. frequently visited Jacob. Jacob's caregiver supervised three visits a week between T.F. and Jacob, and each parent also had weekly visits at a visitation center. The quality of their visits was good. However, the visitation center terminated its services to T.F. in June 2013 because she cancelled too many visits. The Agency then extended J.W.'s visitation at the center to allow T.F. to visit Jacob.

T.F. was living at a homeless shelter. She was participating in therapy twice a week. In June, T.F. and J.W. had another incident of domestic violence. When the social worker asked T.F. to attend a codependency group, she brought J.W. with her.

J.W. was living on the street. According to his therapist, J.W. displayed significant mental health problems, including paranoia and behavior consistent with psychosis. J.W. became irate during his assessment for anger management classes and was referred to a higher level of care for therapeutic intervention.

Jacob was a healthy, calm and happy baby, who was developmentally on target. The caregiver had no concerns about his behavior or development.

The Agency allowed the parents to have unsupervised visits with Jacob at Agency offices. However, the Agency reinstated supervision requirements after J.W. punched

T.F. in the face, breaking her eyeglasses, grabbed her by the throat and tried to tie a torn T-shirt around her neck. T.F. said she started the incident by hitting J.W. and tearing his shirt.

After several incidents in which J.W. became irate with social workers, the court granted the Agency's motion to suspend J.W.'s visitation with Jacob. On one occasion, J.W. held Jacob while he yelled obscenities at Agency staff. He would not hand Jacob to a social worker. On another occasion, J.W. allowed Jacob to choke on a baby wipe after the social worker directed him to take the wipe from the baby.

T.F.'s therapist said T.F. was highly motivated to reunify with Jacob. The primary obstacle to reunification was her relationship with J.W. and the poor choices she made to appease him. T.F. was very protective of J.W. and resisted aspects of her treatment program. She was not consistently attending a support group for victims of domestic violence.

In November and December 2013 T.F.'s visitation with Jacob became inconsistent due to reported illnesses. She overslept and missed a specially arranged Christmas visit with Jacob. She refused the caregiver's offer to reschedule the visit, saying she would see him at her regular visit. T.F. participated in services but made little progress addressing domestic violence. In December, at the courthouse, J.W. berated T.F., calling her vulgar names in front of bystanders, including children. When T.F. tried to move away, J.W. followed her. She did not seek assistance. T.F. lost her shelter housing because of poor compliance with program requirements. The social worker said T.F. demonstrated

4

minimal progress in mitigating the original protective issues and could barely meet her own daily needs.

J.W. remained homeless. He claimed he was employed but would not allow the Agency to verify his employment. When the social worker tried to discuss the case plan, J.W. said the Agency was attacking and persecuting him.

In January 2014 the social worker reported that Jacob was a healthy, social little boy who was meeting his developmental milestones. His parents loved him very much. However, J.W. and T.F.'s relationship was volatile, their participation in services was inconsistent and they had not been able to secure stable housing. The Agency referred Jacob for placement in a concurrent home and began to look for a potential adoptive home for him.

Between January and April, the parents did not consistently participate in services. T.F. frequently cancelled her visits with Jacob. In April T.F. tested positive for marijuana and the Agency disallowed unsupervised visits.

J.W. underwent a psychological evaluation in April. He was diagnosed with antisocial personality traits and symptoms related to antisocial personality disorder, including lack of insight, externalizing blame, lack of trust in others, feelings of being persecuted, a sense of entitlement, failure to follow rules set by in place by child welfare services, impulsivity, irresponsibility and aggressiveness when feeling threatened. The psychologist recommended that J.W. continue to participate in mental health services such as behavioral and cognitive therapy. He needed to improve his insight into

5

problems behaviors, anger management, parenting, increase his stability and positive social support, and obtain stable housing.

At the 12-month review hearing, the court terminated reunification services and set a section 366.26 hearing. An adoptions social worker was assigned to the case in early May.

T.F. missed two scheduled visits with Jacob in June and three in July. At a visit on July 30, Jacob had a dirty diaper at the beginning of the visit. T.F. telephoned J.W. and asked him to bring some diapers to her. When J.W. arrived, he began yelling at the caregiver and accusing her of not properly caring for Jacob. The caregiver accompanied T.F. into the bathroom to change Jacob's diaper. T.F. became upset, yelled and cursed at the caregiver, and threw the diaper at her.

The social worker supervised a visit on August 1. Jacob started to cry when he saw J.W. and T.F. They attempted to comfort him. When T.F. put him down, Jacob quickly walked to the social worker, put his arms around her legs and hid his face from his parents. When T.F. tried to get Jacob to come to her, he refused and held onto the social worker. Jacob continued to cry after T.F. picked him up. After five minutes, the adults decided to take Jacob outside to calm him down. He continued to cry and tried to get T.F. to release him. When she did, he went directly to the social worker. T.F. took Jacob into her arms and held him while he continued to cry. He eventually fell asleep. At the end of the visit, T.F. and J.W. kissed their son. Jacob did not show any distress when the visit ended. When he returned to his caregiver's home, he smiled and jumped up and down when the caregiver opened the door.

6

On August 7 Jacob began to cry as the social worker drove to the park for a visit. After a few minutes, Jacob stopped crying and explored the park. His parents followed him and were appropriately protective. Throughout the visit, they told Jacob they loved him. On August 14, Jacob was able to calm himself by the time they arrived at the park. His parents followed him as he explored the park. Jacob fell asleep in T.F.'s arms. At the end of the visit, Jacob easily separated from his parents. The parents cancelled visits on August 21 and September 4.

J.W. filed a section 388 petition seeking Jacob's return to his care or alternatively, an additional period of reunification services.

A hearing on J.W.'s modification petition and the section 366.26 hearing was held on September 25 and 26, and October 9, 2014. J.W. testified the primary protective concern in his son's case arose because one of T.F.'s other children had passed away. The only protective concern concerning his behavior was his opposition to T.F.'s use of psychotropic medications. He participated in services. He and T.F. were separated. J.W. was working at a restaurant, a drycleaners and in construction. He would be eligible for housing when Jacob was placed in his care. J.W. was able to arrange childcare for Jacob.

The social worker testified J.W. visited Jacob seven times since October 2013. She believed even if J.W. were employed and had stable housing, it would not be safe to place Jacob in his care. J.W. did not complete domestic violence treatment and displayed volatile behaviors. While J.W.'s visits with Jacob appeared to be positive, they did not share a parent/child bond. J.W. continued to blame the Agency for his current situation. He did not maintain regular visits with Jacob. As a result, Jacob became distressed when

7

he saw J.W. J.W. displayed aggressive behaviors toward Agency staff, the caregiver and T.F. in Jacob's presence.

The social worker said the Agency had always known that Jacob's caregiver did not want to adopt. The previous social worker identified a concurrent home for Jacob but the family had personal issues and the placement fell through. The maternal grandmother's request for placement was denied due to her child welfare history.

The social worker acknowledged Jacob was required to undergo a comprehensive developmental evaluation before he could be adopted. Jacob had a developmental screening in September 2013, with no concerns noted. The developmental evaluation could occur before or after a section 366.26 hearing. The social worker did not have any concerns about Jacob's adoptability. He was a happy and handsome child in good physical health with no developmental concerns. Jacob was active and playful, and enjoyed being outside.

The social worker said she identified 34 families in San Diego County interested in adopting a child like Jacob. During the previous five months, she had been reviewing the home studies of those families. There were no factors that made Jacob difficult to place for adoption. She had not identified a prospective adoptive home for Jacob. The social worker said she started reviewing home studies at the end of June or the beginning or end of July.

The social worker received approximately 10 home studies at a time. She reviewed the home studies to determine whether the family and child would be an appropriate match. If she believed there was a match, she would contact the family to see

if they were still available.  If the family was interested, the social worker would set up transitional visits and disclose the child's background to the family.  The social worker said she did not find a match for Jacob in the first 10 home studies and was currently reviewing the second set of home studies.  She could not say why it was taking so long to find a family for Jacob.  Her supervisor was in the process of reviewing the second set of home studies.

The social worker believed the benefits of adoption would outweigh any detriment to Jacob caused by termination of parental rights.  Jacob had never been in his parents' care.  Their visits with him were not consistent.  T.F. had untreated mental health problems and did not resolve her volatile and dependent relationship with J.W.  Her contact with Jacob was inconsistent and affected her ability to establish a parent/child relationship with him.

The court found that J.W. did not show changed circumstances and denied his section 388 petition.  The court directed the parties to submit points and authorities on whether there was clear and convincing evidence to show that Jacob was likely to be adopted within a reasonable time if parental rights were terminated.

At a hearing on October 9, 2014, the court said there was sufficient evidence to show that Jacob was adoptable independent of, or aside from, the social worker's opinion. His caregiver had no concerns about his health or emotional well-being.   Jacob had a developmental screening that did not reveal any concerns.  He was less than two years old and had age-appropriate skills.  The court found there were no exceptions that would make termination of parental rights detrimental to Jacob, and terminated parental rights.

9

DISCUSSION

I. *Section 388*

Under section 388, a parent, interested person or the dependent child (petitioner) may petition the court to change, modify or set aside a previous order on the grounds of changed circumstances or new evidence. (§ 388, subd. (a).) The petitioner has the burden to show a change of circumstances or new evidence, and that the proposed modification is in the child's best interests. (*In re Jasmon O*. (1994) 8 Cal.4th 398, 415; Cal. Rules of Court, rule 5.570(e).)

We review the grant or denial of a petition for modification under section 388 for an abuse of discretion. (*In re Shirley K*. (2006) 140 Cal.App.4th 65, 71; *In re Casey D*. (1999) 70 Cal.App.4th 38, 47.) While the abuse of discretion standard gives the trial court substantial latitude, "[t]he scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion." (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297.)

In evaluating whether the petitioner has met his or her burden to show changed circumstances, the juvenile court should consider a number of factors, including: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be

10

easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532, 531.)

Under section 388, subdivision (a), the focus of a petition for modification is on whether the petitioner has shown a legitimate change of circumstances. The court reasonably determined J.W. did not make the required showing. There is substantial evidence to support the finding that J.W.'s circumstances were not yet changed. (*In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.)

J.W. did not make substantial progress in mitigating the risks that necessitated Jacob's continued removal from his care. Despite participating in services, J.W. did not ameliorate the risks to Jacob. His visits with Jacob were suspended for approximately two months because he displayed aggressive and volatile behaviors during visits. Later, he yelled and cursed at the caregiver and T.F. when Jacob was present. He did not complete services recommended for mental health treatment and anger issues, including domestic violence. At the time of the section 388 hearing, J.W. did not have stable housing and was still living on the street. He testified that if Jacob was placed in his care, he would then be eligible for housing. Thus, J.W. did not make the required showing that he had stabilized his circumstances to the degree necessary to provide a safe, stable home to his son. The record supports the finding it was not in Jacob's best interest to be placed with J.W. or to delay the selection and implementation of his permanency plan.

11

A. *Legal Framework for Termination of Parental Rights*

At a section 366.26 hearing, the court may select one of three alternative permanency plans for the dependent child—adoption, guardianship or long-term foster care. (*In re Taya C.* (1991) 2 Cal.App.4th 1, 7.) If the child is adoptable, there is a strong preference for adoption over alternative permanency plans. (*San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 888; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 808-809.)

A finding of adoptability requires "clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*In re Zeth S.* (2003) 31 Cal.4th 396, 406 (*Zeth S.*); § 366.26, subd. (c)(1).) The question of adoptability usually focuses on whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.)

If the court determines that the child is likely to be adopted within a reasonable time, the court is required to terminate parental rights unless the parent shows that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivisions (c)(1)(A) and (c)(1)(B). (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345.)

Section 366.26, subdivision (c)(1)(B)(i), provides an exception to termination of parental rights when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." This court has

interpreted the phrase "benefit from continuing the relationship" to mean "the [parent-child] relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*)

The reviewing court determines whether the record contains substantial evidence from which the court could find clear and convincing evidence that the child was likely to be adopted within a reasonable time, as well as substantial evidence to support the juvenile court's finding the child will not be greatly harmed by termination of parental rights. (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1562; *Zeth S.*, *supra*, 31 Cal.4th at p. 406.) If the findings are supported by substantial evidence, the reviewing court must affirm the juvenile court's rejection of the exceptions to termination of parental rights. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

B. *There Is Substantial Evidence To Support the Court's Finding That Chase Was Likely To Be Adopted Within a Reasonable Time*

J.W. and T.F. contend there is not substantial evidence to support the finding that Jacob was likely to be adopted within a reasonable time if parental rights were terminated. They argue that the Agency had been searching for an adoptive placement for Jacob for almost five months and had failed to locate an appropriate home. J.W. and T.F. also argue the social worker misrepresented the number of families interested in adopting a child like Jacob by claiming there were 34 interested families when she had already determined that 10 of those families were not good matches for Jacob. They further contend there is no indication the Agency would be able to locate an adoptive

13

home for Jacob within a reasonable time and therefore the court erred when it found that Jacob was adoptable.

The court concluded that notwithstanding the social worker's expert opinion, there was clear and convincing evidence to show that Jacob was adoptable. That the Agency had been looking for an adoptive home for Jacob for approximately five months does not defeat the adoptability finding. The social worker had worked in adoptions for less than a year. She estimated that of her eight cases, "90 percent" were in a prospective adoptive placement when she received the case. The record thus supports the reasonable inferences the social worker was inexperienced and that Jacob was the first child for whom she had to find an adoptive placement. That her supervisor was screening the second group of possible adoptive families supports this inference. In addition, the previous social worker had identified a concurrent home for Jacob. Although that placement fell through because of personal issues, the prior identification of possible adoptive placement supports the adoptability finding.

In assessing whether a child is adoptable, the focus is on whether the child's age, physical condition and emotional status will make it difficult in finding a family that is willing to adopt the child. (*Zeth S., supra,* 31 Cal.4th at p. 406.) There is nothing in the record to indicate it would be difficult to find an adoptive home for Jacob. Jacob was less than two years of age. He was a happy, handsome child in good physical health. He was active and playful, and there were no concerns about his development. We conclude that the record contains substantial evidence to support the court's finding. (§ 366.26, subd. (c)(1).)

14

C. *There Is Substantial Evidence To Support the Court's Finding the Beneficial Parent/Child Relationship Exception Did Not Apply*

J.W. and T.F. contend there is not substantial evidence to support the juvenile court's finding the beneficial parent/child relationship exception to termination of parental rights did not apply. J.W. asserts the Agency acknowledged his deep love for his son and that this evidence supports a finding that he and his son shared a strong attachment. T.F. discusses her positive visits with her son and argues that despite some missed visits, she visited him 31 times between May 2 and August 1, and thus met the requirement of regular visitation and contact. T.F. contends she parented Jacob during visits by soothing, feeding and cleaning him, and keeping him safe from harm.

The court could reasonably conclude that J.W. did not maintain regular visitation and contact with Jacob. J.W. continued to exhibit volatile and aggressive behavior, including verbal abuse in Jacob's presence. As a result of those outbursts, the court suspended his visitation for two months. As a result of J.W.'s volatile behaviors and sporadic visitation, the social worker did not believe J.W. had a parent/child bond with Jacob. The record shows that Jacob was often apprehensive at the beginning of his visits with J.W. He did not approach his father for comfort. To the contrary, on several occasions, he clung to the social worker, avoiding J.W. Although Jacob enjoyed exploring the park during visits, Jacob did not display a significant attachment to his father. The court could reasonably determine termination of J.W.'s parental rights would not be detrimental to Jacob. (§ 366.26, subd. (c)(1)(B).)

T.F. was offered frequent visitation with Jacob. Some of her weekly visits with Jacob were unsupervised throughout much of the case. She acknowledges she did not take full advantage of the visitation that was offered to her. While the record shows that T.F.'s interactions with Jacob were appropriate, the record does not indicate he sought her out for comfort or that he was bonded to her. The record supports a finding that T.F. did not establish a parent/child relationship with Jacob. In addition, T.F. did not stabilize her circumstances during the 22-month dependency case. The court could reasonably conclude that Jacob's interests in a continued relationship with T.F. did not outweigh his interests in the security of an adoptive placement with a safe and stable family. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) We conclude there is substantial evidence to support the juvenile court's finding that termination of parental rights would not be detrimental to Jacob. (§ 366.26, subd. (c)(1)(B).)

## DISPOSITION

The orders are affirmed.

NARES, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

16